**Opinion issued August 20, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00146-CV

———————————

## IN THE INTEREST OF J.S., A CHILD

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2018-00409J

# O P I N I O N

In this case, the trial court terminated the parental rights of A.W.H. (Mother)

and H.L.S. (Father) to their minor daughter, J.S. (Julie).[1] The trial court terminated

Mother's parental rights under Family Code section 161.001(b)(1)(E), (O), and (P),

---

[1]   In this opinion, we refer to J.S. by a pseudonym to protect her privacy and for ease
of reading.

and the court terminated Father's parental rights under section 161.001(b)(1)(E) and (O).

Both Father and Mother filed notices of appeal. In two issues, Father contends that the Department of Family and Protective Services (DFPS or the Department) failed to present sufficient evidence to support the trial court's findings that he committed two statutory predicate grounds for termination of his parental rights under section 161.001(b)(1)(E) and (O). Mother's counsel filed an *Anders* brief, stating that there were no arguable grounds for reversal and that an appeal of the trial court's termination order was frivolous.

We affirm.

## Background

Julie was born in September 2017. She is Mother and Father's only child together. Mother also has a son, who is five years older than Julie, and another daughter, who is a year older than Julie. Neither of these children was involved in the underlying proceedings. Father has an adult daughter and three grandchildren.

DFPS caseworker Scarlet Vargas testified that the Department became involved in Julie's life when she was an infant. Mother had relinquished her parental rights to Julie's half-sister in late 2017, and the Department learned that Mother had given birth to another child, Julie. The Department filed its original petition seeking termination of Mother's and Father's parental rights and temporary managing

conservatorship over Julie in February 2018.[2] After an adversary hearing, the trial court ordered Father to submit to DNA testing to establish Julie's paternity. Father did so, and the DNA results revealed that Father could not be excluded as Julie's biological father. The trial court subsequently entered an order establishing the parent-child relationship between Father and Julie.

The Department created family service plans for both Mother and Father. The trial court admitted both service plans into evidence at the final hearing. Both service plans stated the following under "Reason for Child Protective Services Involvement":

> [Mother] has tested positive in a recent drug test for methamphetamine, cocaine, amphetamines, hydrocodone and Codeine. The mother admitted she fled with the infant [Julie] to hinder investigation. There is concern that the mother's ongoing drug [use] and willingness to flee with the child threatens the safety of the child. The alleged father [Father] and child's mother are uncertain of [Julie's] paternity. Therefore child's birth father is unknown and paternity needs to be established before the alleged father on birth record proceed with services through the Department. [Mother] relinquished her parental rights to the agency and the Texas Department of Family and Protective Services has been named permanent managing conservator of [Julie's older half-sister]. [Julie's older half-brother] is safely placed with his maternal grandparents and has been there for over one year. [Julie],

---

[2]    The Department attached to its original petition an affidavit supporting the removal of Julie from Mother's care, completed by DFPS caseworker Ave Maria Miller. This affidavit went into detail concerning the referrals that brought Julie to the Department's attention, Mother's subsequent actions that led the Department to initiate termination proceedings, Mother's prior history with the Department, and Mother's and Father's criminal histories. This affidavit was not admitted into evidence at the final hearing, and Miller was not called as a witness to testify concerning the Department's initial investigation into Julie's care.

currently age three months[,] is currently in a Parental Child Placement, (PCSP) with a relative. It is the Department's opinion that there is an immediate and continuing danger to the three month old child. All reasonable efforts have been made to prevent the removal, and that it is contrary to the welfare of the child to remain with either parent.

Under "Initial Concerns," dated March 15, 2018, the service plan listed, among other things: Julie's young age; positive drug tests for both Mother and Father; Mother's and Father's inability to provide a safe environment for Julie; Mother's "history of substance abuse and CPS history"; Father's history of substance abuse; Mother's failure to "change[] behaviors that exposed the children to risk of harm"; and Mother's lack of cooperation during the initial investigation and in taking drug tests. The service plans required both parents to submit to psychosocial evaluations, participate in substance abuse assessments, maintain stable employment and provide proof of employment, comply with all visitation guidelines, submit to random urinalysis and hair drug testing, complete parenting classes, and maintain safe and stable housing.

The trial court held the final hearing on January 17, 2019. The trial court admitted evidence including the family service plans, a status hearing order dated April 5, 2018, drug test results for both Mother and Father, and certified copies of criminal judgments and sentences for both Mother and Father. The drug test results for Mother dated back to April 2015, more than two years before Julie was born in September 2017. From May 2015 through August 2017, prior to the pendency of the

4

underlying termination proceedings, Mother had eight drug tests using hair samples that yielded positive results for various combinations of amphetamines, methamphetamine, cocaine, cocaine metabolites, and alcohol.[3] These drug test results included results from August 2017, one month before Julie was born, in which Mother tested positive for cocaine, cocaine metabolites, and PCP. The drug test results admitted into evidence also included the following results for Mother from drug tests during the pendency of the termination proceedings: in February 2018, she tested positive for alcohol, amphetamines, methamphetamine, cocaine, and cocaine metabolites; in June 2018, she tested positive for alcohol, amphetamines, methamphetamine, cocaine, and cocaine metabolites; in August 2018, she tested positive for alcohol, amphetamines, methamphetamine, cocaine, and cocaine metabolites; in October 2018, she tested positive for alcohol and cocaine; and in December 2018, she tested positive for cocaine and cocaine metabolites.

Father had the following positive drug test results using a hair sample: in February 2018, April 2018, June 2018, and August 2018, he tested positive for cocaine and cocaine metabolites; and in October 2018, he tested positive for cocaine, cocaine metabolites, and marijuana.

---

[3]     Mother also had negative drug test results using a urine sample in May 2015, June 2015, September 2015, October 2015, May 2017, and June 2017.

With respect to the parents' criminal histories, Mother was convicted of the Class B misdemeanor offense of Driving While Intoxicated (DWI) in June 2014, the Class A misdemeanor offense of assault in August 2015, and the Class A misdemeanor offense of DWI—second offender in March 2017. Father was convicted of the felony offense of robbery in August 1981, the Class A misdemeanor offense of assault in June 1984, the second-degree felony offense of possession of a controlled substance—cocaine in March 1990, the second-degree felony offense of possession of a controlled substance—cocaine in January 1992, and the state jail felony offense of manufacturing and delivering a controlled substance—cocaine in July 2014. Father pleaded guilty to the 1984 assault offense and the 2014 manufacturing and delivery offense, and he pleaded no contest to the 1990 possession offense.

Vargas testified that while Mother had completed several of the requirements of her service plan, she had not completed a psychiatric evaluation, and she continued to test positive for drugs throughout the pendency of the case. Vargas stated that the Department made payments on two different occasions for Mother to attend the psychiatric evaluation, but Mother "continued to cancel or was a no-show" for the evaluation. Mother participated in some of the drug tests that the Department required, but she did not attend on at least six occasions. Although Mother provided paycheck stubs to Vargas during the beginning of the proceedings, she had not done

so "lately," and Vargas did not know if Mother was employed at the time of the final hearing. Vargas stated that she believed Mother was a danger to Julie because Mother "continues to test positive for drugs and we believe she does not have a stable housing for her children and we believe she's also not financially stable." DFPS was also concerned about Mother's criminal history, which included two DWI offenses.

Vargas testified that Mother and Father had supervised visitation with Julie while the case was pending. However, those visits stopped in September 2018 due to the parents' continuing positive drug test results. Vargas stated that Julie was "always crying" during these visitations, that Julie did not want to be in the room with her parents, and that, during two visits, Vargas smelled alcohol on Mother's breath.

With respect to Father, Vargas testified that he had completed most of the requirements set out in his service plan, but he had not had negative drug test results. Father had not provided Vargas with paycheck stubs, but he had provided documentation that he received monthly disability checks. Vargas testified that, due to Father's drug testing results, she was concerned for Julie's safety, and she did not believe that Father could provide a safe and stable environment for Julie. She stated:

> He continues to test positive for his drug result, and it is more concerning that he keeps denying that he's using drugs. And he tells me that he tests negative for his parole officers and he tests positive for our test and that our tests must not be correct.

Vargas was aware that Father had a past criminal history, but she did not know the specifics of his past convictions.

Vargas also testified that Julie was currently placed in a foster home and that she was doing "wonderful" in that home. Julie was "very healthy" with no medical needs, and she was "very bonded" to her foster mother. Vargas stated that Julie has "thrived" in this particular placement, that she is "very attached" to her foster mother, and that she "looks at Foster Mom before responding to another adult." Julie's foster mother had expressed to the Department that she wished to adopt Julie. Vargas believed that it would be detrimental to Julie to remove her from the foster home and return her to her parents. She did not believe that Mother and Father could "provide a long-term care for [Julie] due to their current and past behaviors."

Vargas agreed with Mother's counsel that Mother had completed several requirements of her service plan, including completing substance abuse counseling, the psychosocial evaluation, individual therapy, and substance abuse therapy. Vargas did not know where Mother was currently working and did not have any documentation, but she acknowledged that she had spoken to Mother about her employment. She also agreed that Mother had attended all visitations with Julie up until those visitations were stopped by the court and that Mother had attended all court hearings. Vargas further agreed that Mother had kept in contact with her, had provided names of family members who could potentially be a placement for Julie,

and had expressed her desire to finish her required services and regain custody of Julie.

On cross-examination by Father's counsel, Vargas testified that, at the time Julie came into DFPS's care, there were no concerns about Father's conduct. Vargas acknowledged that Father has an adult child and had never had any involvement with the Department prior to this proceeding. She agreed that Father had named his adult daughter as a possible placement for Julie, but she testified that the Department never conducted a home study on Father's adult daughter because his daughter stated that she had children of her own and she was not sure if she could provide long-term care for Julie. Vargas also agreed with Father's counsel that, with the exception of his positive drug tests, he had completed the requirements of his service plan. She further agreed that Father had shown her paperwork from his parole officers indicating that his urine tests were negative for drugs. She also agreed that Father had been forthcoming with her about his prescription pain medications, and she was not concerned about his use of his prescribed medications, which included codeine. Vargas testified that she had not visited Father's apartment to gauge its appropriateness for Julie, stating that she usually does that "towards the end of the case, depending on how the case is going," but because Father continued to have positive drug tests, the Department "did not look into his home."

Father testified that he met Mother around October 2016, that he was around for her entire pregnancy, and that he was there the day Julie was born. He stated that he had never witnessed Mother use illegal drugs. He acknowledged that he had used cocaine, but he stated that the last time he used it was in 1997. He disputed all of the positive drug test results that had occurred during the pendency of the proceedings,[4] stating that he had only been taking Tylenol and that he did not use illegal drugs. He stated, with respect to his 2014 conviction for delivery of cocaine, "I guess I got [mistaken] by somebody else," and that it was not his cocaine that he was delivering. He stated that his plan for parenting Julie was to "take her home and raise her like a father should do." He believed that he could provide a safe and stable environment for Julie, stating that he had lived in his apartment for two years, that he had the financial ability to care for her, and that he would be able to take her to any necessary doctor's appointments. When asked if he believed Mother could be a good mom to Julie, he stated, "I have no doubt about [Mother]."

Mother testified and acknowledged that she had used methamphetamine in the past, estimating her usage at "every other couple [of] weekends." She stated that she

---

[4]     On questioning by his counsel, Father stated, "I feel like they [the positive drug test results] are false." He also stated that he has back pain and a broken ankle, and his doctor had prescribed Tylenol and Tramadol for him, and he had been taking these medications for several months. He stated that he believed these medications interfered with his drug test results because the medications have codeine as an ingredient.

stopped using methamphetamine in August 2018. She did not recall using cocaine and PCP in August 2017,[5] the month before she gave birth to Julie. Mother acknowledged that she had prior convictions for DWI, but she denied drinking or using illegal drugs while she was pregnant. Mother also acknowledged that she had been unemployed as of December 2018, but she stated that she was looking for a long-term career to support herself and Julie, not a short-term, temporary job.

On examination by her counsel, Mother acknowledged that she had previously relinquished her parental rights to Julie's half-sister, but that was not what she wanted to do with respect to Julie. She stated that she had completed the requirements of her service plan, attended court hearings, attended visitation with Julie until the court stopped the visitation sessions, and kept in contact with her attorney and with the Department. She requested that Julie be returned to her or that she be allowed to continue participating in whatever additional services the Department required of her, including going to inpatient drug treatment. Mother testified that she had been living with her brother for three months and that she had been laid off in December 2018, one month before the final hearing, from a job she had held for over a year. She stated that her brother and other members of her

---

[5] On cross-examination by Julie's ad litem attorney, Mother stated, "I have not used PCP."

11

extended family were supportive of her and were willing to help her while she searched for a new job, saved money, and tried to find an apartment of her own.

Misty Harty was Julie's appointed Child Advocate, and she had been working with Julie since the beginning of the proceedings. She had viewed Julie in her foster home, and she testified concerning her thoughts on the appropriateness of that placement:

> [Julie] is extremely bonded with her foster family. She has made leaps and bounds, met all of her milestones, is extremely attached and bonded to not only the foster mother but the extended foster family. Well integrated into the family. All of her needs—emotional, social—are being met there. Just an extremely happy child.
>
> . . . .
>
> I've had opportunities to witness other children in foster homes and you can tell that the child is not bonded; and in this home with this baby, she is happy. She's always smiling. The only occasion that we've really seen her upset is during visitations [with Mother and Father], and so it's a stark comparison.

Harty also testified concerning Child Advocates' position that Mother and Father were both a continuing danger to Julie's physical and emotional well-being. With respect to her concerns regarding Mother, Harty testified:

> [Mother] has not had stable housing. She has not provided check stubs to show verification [of] being able to financially support the child. There have been visits where she either left early or wanted to reschedule. And some of the visits that were observed, [Father] was doing most of the interacting with the baby. The baby seemed to be in distress, crying. We tried to suggest some changing in the time schedule so that the baby wasn't near her nap time to address some of the crying issues. That didn't seem to help. So there are a lot of concerns. The continued drug use, the continued positive hair and [urinalysis results];

12

more specifically, the most recent one that showed an increase of drug use.

Harty stated that she was also concerned that Mother was denying her drug use, even though she continued to test positive for drugs throughout the pendency of the case.

With respect to Father, Harty testified:

> We've had an opportunity to go to [Father's] home. He lives in a one-bedroom home. He is living on disability, which is a limited income. We did discuss with him how will he be able to financially support the child. He offered his [adult] daughter as another relative placement in the event that the child could not be placed with him. At the time, his daughter was living with someone else and didn't have—was not raising several of her own children, and so that wasn't a viable option. Although [Father], during visits, was holding the child, there was very little interaction, very little evidence of the knowledge that he gained from the parenting classes. And the child didn't seem receptive to his presence or Mom's presence, so that's of grave concern as well.

Harty testified that, from what she observed during Father's visitation with Julie, although he had completed parenting classes and other services, he had not been able to demonstrate what he had learned from those classes. She also stated that Father's continued positive drug testing results were of "major concern" to Child Advocates.[6] Harty stated that Child Advocates was recommending termination of both Mother's

---

[6]    On cross-examination, Father's counsel asked Harty why Child Advocates believed that termination of parental rights was in Julie's best interest as opposed to granting conservatorship to the Department and allowing the parents more time to complete their services and show negative drug tests. Harty stated, "In all honesty, the parents have had adequate time to work their services and to meet the agency's expectations of clean drug screens. It is my understanding—and please correct me—the agency is looking for six months of consecutive nondrug use and clean drug screens and we haven't had that in the case. That is a grave concern."

and Father's parental rights. She also stated that Julie was in a "wonderful foster home" with a foster mother who "has continually provided all of this child's needs" and was "the only family that this child knows." Harty believed that it would be detrimental to Julie to remove her from this foster home.

The trial court terminated Mother's parental rights to Julie under Family Code section 161.001(b)(1)(E), (O), and (P), and it terminated Father's parental rights to Julie under section 161.001(b)(1)(E) and (O). The court also found that termination of the parents' rights was in Julie's best interest. Both Mother and Father filed notices of appeal of the trial court's order terminating their parental rights to Julie.

## Father's Appeal

In his two issues on appeal, Father contends that the Department failed to present sufficient evidence that he committed one of the statutory predicate grounds for termination of his parental rights. Specifically, in his first issue, he argues that the evidence does not support a finding that Julie was removed from him for abuse or neglect, as required by section 161.001(b)(1)(O). In his second issue, he argues that the Department failed to present sufficient evidence that he engaged in conduct or knowingly placed Julie with persons who engaged in conduct which endangered her physical or emotional well-being.

## A. *Standard of Review*

A trial court may order termination of the parent-child relationship if DFPS proves, by clear and convincing evidence, one of the statutorily enumerated predicate findings for termination and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (stating that federal due process clause and Texas Family Code both mandate "heightened" standard of review of clear and convincing evidence in parental-rights termination cases). DFPS must prove both elements—a statutorily prescribed predicate finding and that termination is in the child's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d at 803. The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re E.N.C.*, 384 S.W.3d at 802.

In a legal sufficiency review, we look at all of the evidence in the light most favorable to the trial court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *In re E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *see In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). We must give appropriate deference to the factfinder's conclusions, which means we must assume that the factfinder

15

resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d at 266). We should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible, but this does not mean that we must disregard all evidence that does not support the finding. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Disregarding undisputed facts that do not support the finding could skew our analysis of whether clear and convincing evidence exists. *In re J.F.C.*, 96 S.W.3d at 266; *see In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018) ("In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding."). "In cases requiring clear and convincing evidence, even evidence that does more than raise surmise and suspicion will not suffice unless that evidence is capable of producing a firm belief or conviction that the allegation is true." *In re K.M.L.*, 443 S.W.3d at 113. If we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven is true, we must conclude that the evidence is legally insufficient. *In re E.N.C.*, 384 S.W.3d at 802 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

When a parent challenges the factual sufficiency of the evidence supporting the trial court's findings, we review all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). We should

16

inquire whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *see In re A.C.*, 560 S.W.3d at 631 ("In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding."). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 266). In applying this standard, our review "must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re H.R.M.*, 209 S.W.3d at 108 (quoting *In re C.H.*, 89 S.W.3d at 26); *see also In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that, despite heightened standard, we must still provide due deference to decisions of factfinder, who had full opportunity to observe witness testimony first-hand and was sole arbiter of assessing witness credibility and demeanor).

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground." *In re N.G.*,

—S.W.3d—, No. 18-0508, 2019 WL 2147263, at *1 (Tex. May 17, 2019) (per curiam). Family Code section 161.001(b)(1)(M) provides that parental rights may be terminated if there is clear and convincing evidence that the parent has had their parent-child relationship with respect to another child terminated based on conduct in violation of section 161.001(b)(1)(D) or (E). *See id.* at *2 (citing TEX. FAM. CODE ANN. § 161.001(b)(1)(M)). When a trial court has terminated a parent's rights under section (D) or (E), that becomes a basis to terminate the parent's rights to other children, and that ground alone can be sufficient to support termination in a later proceeding; thus, terminating parental rights under section 161.001(b)(1)(D) and (E) has "significant" collateral consequences that can affect a parent's rights to other children. *Id.* The Texas Supreme Court has therefore held that "[w]hen a parent has presented the issue on appeal, an appellate court that denies review of a section 161.001(b)(1)(D) or (E) finding deprives the parent of a meaningful appeal and eliminates the parent's only chance for review of a finding that will be binding as to parental rights to other children." *Id.* at *3. "Allowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *Id.* at *4.

On appeal, Father challenges the trial court's findings of two statutory predicate grounds for termination of his parental rights: subsection (E) and

subsection (O). Because of the due process implications concerning the trial court's finding that Father violated subsection (E), we address the sufficiency of the evidence to support that finding first.

**B.     *Analysis***

Family Code section 161.001(b)(1)(E) provides that the trial court may terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Under this subsection, the relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Termination under subsection (E) must be based on more than a single act or omission; instead, "what is required is a voluntary, deliberate, and conscious course of conduct." *Id.* This conduct does not have to occur in the presence of the child. *Id.* Courts may consider conduct that occurred before the child's birth and both before and after the Department removed the child from the parent's home. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

"Endanger" means "more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment," but "endangering conduct need not be directed at the child." *In re E.N.C.*, 384 S.W.3d at 803; *see Jordan*, 325 S.W.3d at 723 ("[D]anger to a child need not be established as an independent proposition and may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury."); *In re J.J.S.*, 272 S.W.3d 74, 78 (Tex. App.—Waco 2008, pet. struck) (stating that danger to child's physical or emotional well-being may be inferred from parental misconduct). Endangerment can occur through both acts and omissions. *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.).

"Conduct that subjects a child to life of uncertainty and instability endangers the child's physical and emotional well-being." *Jordan*, 325 S.W.3d at 723. A parent's drug use and the effects of that drug use on the parent's life and ability to parent may establish an endangering course of conduct. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *In re A.J.H.*, 205 S.W.3d 79, 81 (Tex. App.—Fort Worth 2006, no pet.) (quoting *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)). "Illegal drug use creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting." *In re A.A.M.*, 464 S.W.3d at 426 (citing *Walker*, 312 S.W.3d at 617).

Courts may consider whether the parent's drug use continues after the child is removed from the parent's care, "in the face of periodic drug tests that placed [the parent's] relationship with [their] child in jeopardy." *In re S.M.L.D.*, 150 S.W.3d 754, 758 (Tex. App.—Amarillo 2004, no pet.); *In re J.T.G.*, 121 S.W.3d 117, 127 (Tex. App.—Fort Worth 2003, no pet.) (considering fact that mother's drug use continued after children were removed from home and noting that record demonstrated "numerous occasions" on which mother tested positive for drugs or failed to submit to requested drug screening as required by service plan); *see also In re E.R.W.*, 528 S.W.3d 251, 264–65 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.").

The parent's criminal history is also a factor that may be considered when determining if the parent has engaged in an endangering course of conduct. *In re U.P.*, 105 S.W.3d 222, 233 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *see also In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.) ("Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct."). "Routinely subjecting a child to the probability that she will be left alone because

21

her parent is in jail, endangers the child's physical and emotional well-being." *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.). Courts may consider a parent's criminal offenses that occurred prior to the birth of the child who is the subject of termination proceedings, and these offenses "can still be considered as part of a voluntary, deliberate, and conscious course of conduct" that has the effect of endangering the child. *Id.*

In this case, the Department presented evidence that Father has tested positive for drugs on several occasions during the pendency of the termination proceedings. The Department initially sought temporary managing conservatorship and the termination of Mother's and Father's parental rights in February 2018. The Department's evidence at the final hearing included drug test results indicating that Father tested positive for cocaine and cocaine metabolites in February 2018, April 2018, June 2018, August 2018, and October 2018. Father also tested positive for marijuana in October 2018. The Department also presented evidence that Father has several prior criminal convictions. Although all of Father's convictions occurred prior to Julie's birth in September 2017, two of his prior convictions were for possession of a controlled substance—cocaine—in 1990 and 1992, and one was for manufacturing and delivering a controlled substance—cocaine—in July 2014.[7]

---

[7]    Father was also convicted of robbery in 1981 and misdemeanor assault in 1984.

22

The Department thus presented evidence that Father had a continuing problem with substance abuse and that this problem persisted throughout the termination proceedings. Both Vargas, the DFPS caseworker, and Harty, Julie's Child Advocates representative, considered Father's ongoing drug usage to be a "major concern" and the primary reason why they believed Father could not provide Julie with a safe living environment. Vargas also testified that the fact that Father continued to deny that he was using drugs was of particular concern to her. She acknowledged that Father had shown her paperwork from his parole officers indicating that his urine tests were negative for drugs, but the tests that he completed for the Department, which used hair samples, continued to reflect drug usage. She testified that Father would tell her that the Department's tests "must not be correct."

Texas courts have repeatedly held that a parent's illegal drug usage, even after removal of the child from the home and during the pendency of termination proceedings, may establish an endangering course of conduct because it "creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting." *In re A.A.M.*, 464 S.W.3d at 426; *see also In re E.R.W.*, 528 S.W.3d at 264–65 (stating that parent's decision to use illegal drugs during pendency of termination proceedings can support finding that parent engaged in endangering course of conduct). The appellate record contains evidence that Father has a history with illegal drugs dating back to the early 1990s, when he was convicted of two

charges of possession of cocaine, that he was convicted of manufacturing and delivering cocaine in 2014, and that he continued to test positive for cocaine usage during the pendency of the underlying termination proceedings. Based on these facts, we conclude that the trial court, as the factfinder, reasonably could have formed a firm belief or conviction that Father engaged in conduct that endangered Julie's physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E); *In re K.M.L.*, 443 S.W.3d at 112; *In re E.N.C.*, 384 S.W.3d at 802.

Father testified at the final hearing and stated that he had not used cocaine since 1997. He stated, with respect to his 2014 conviction for manufacturing and delivering cocaine—a charge to which he pleaded guilty—that he was "mistake[n] by somebody else" and that it was not his cocaine that he was delivering. Father disputed all of the positive drug test results, stating, "I feel like they are false."[8] He also testified that, due to health problems including back pain and a broken ankle, he had been taking prescribed medications, including Tylenol and Tramadol, for several months and that these medications had codeine as an ingredient. He stated

---

[8] To the extent Father argues on appeal that the positive drug test results were not reliable or that expert testimony concerning the drug test results was necessary, we note that the trial court admitted Father's drug test results without objection from his counsel. Father made no challenge in the trial court to the reliability of the results, and he did not argue that the test results were inadmissible in the absence of accompanying expert testimony.

that he believed the codeine in these medications interfered with the drug test results. Vargas testified that she was aware that Father had been prescribed medications that contained codeine and that she was not concerned about Father's use of these medications.

The drug test results admitted into evidence reflect that Father's hair samples were tested for opiates—the class of drugs to which codeine belongs—but his hair samples repeatedly tested negative for the presence of opiates. Father's samples repeatedly tested positive, however, for cocaine and cocaine metabolites. Moreover, the trial court, as the factfinder, was the sole judge of the credibility of the witnesses, and the court was free to disregard Father's self-serving testimony that he last used cocaine in 1997. *See In re S.R.*, 452 S.W.3d 351, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("As the finder of fact and sole judge of the credibility of the witnesses, the trial court was free to disregard any or all of the parents' self-serving testimony."); *see also In re A.B.*, 437 S.W.3d at 503 (stating that, even under heightened standard of review due to clear and convincing burden of proof, we must still provide due deference to decisions of factfinder, who had full opportunity to observe witness testimony first-hand and was sole arbiter of assessing witness credibility and demeanor).

Father also argues that there was no evidence in the record tying his positive drug test results and his past criminal history to any present endangerment of Julie.

Courts have repeatedly held, however, that conduct does not have to be directed toward the child to constitute an endangering course of conduct under subsection (E). *See In re E.N.C.*, 384 S.W.3d at 803. This Court has held that the conduct does not have to be directed toward the child and the child does not need to actually be injured by the parent's conduct; instead, "danger to a child need not be established as an independent proposition and may be inferred from parental misconduct." *Jordan*, 325 S.W.3d at 723; *see also In re A.A.M.*, 464 S.W.3d at 426 ("Illegal drug use creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting."); *In re J.J.S.*, 272 S.W.3d at 78 (stating that danger to child's physical or emotional well-being may be inferred from parental misconduct). Father points to no authority requiring the Department to prove how drug use or criminal history specifically endangered a particular child. *See In re J.J.S.*, 272 S.W.3d at 78 ("An actual or concrete threat of injury to the child need not be proved."); *In re U.P.*, 105 S.W.3d at 233 ("Endangering acts need not be directed at the child or cause actual injury or threat of injury to the child."). We decline Father's invitation to impose such a requirement here.

When considering all of the evidence in the record, the disputed evidence that the factfinder could not have credited in favor of its finding that Father violated subsection (E) is not so significant that the factfinder could not reasonably have formed a firm belief or conviction that Father violated subsection (E). *See In re*

26

*J.O.A.*, 283 S.W.3d at 345. We therefore conclude that the Department presented legally and factually sufficient evidence to support the trial court's finding that Father violated section 161.001(b)(1)(E).

We overrule Father's second issue.[9]

### Mother's Appeal

Mother's court-appointed appellate counsel filed an *Anders* brief, stating that, in her professional opinion, the appeal is without merit and there are no arguable grounds for reversal. *See Anders v. California*, 386 U.S. 738, 744 (1967).

*Anders* procedures are appropriate in an appeal from a trial court's final order in a parental-rights termination case when appointed counsel concludes that there are no non-frivolous issues to assert on appeal. *In re K.D.*, 127 S.W.3d 66, 67 (Tex.

---

[9] Because we hold that sufficient evidence exists to support the trial court's finding that Father's conduct violated subsection (E), we need not address Father's argument that the Department failed to present sufficient evidence that Julie was removed from him for "abuse or neglect" and, therefore, that he violated subsection (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (stating that only one statutory predicate ground is necessary to support termination judgment when there is also finding that termination is in child's best interest); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.) (stating same); *see also In re N.G.*, — S.W.3d—, No. 18-0508, 2019 WL 2147263, at *1, *4 & n.1 (Tex. May 17, 2019) (per curiam) (holding that, although appellate court may affirm termination order based on one statutory predicate ground, due process requires appellate court to review trial court's findings under subsections (D) and (E) if challenged by parent on appeal, and noting that in affirming termination order, appellate court's decision to review findings under (D) and (E) but not other predicate grounds challenged by parent on appeal is permissible because "due process demands no more"). We note that Father does not challenge the trial court's finding that termination of his parental rights was in Julie's best interest.

App.—Houston [1st Dist.] 2003, no pet.). In her *Anders* brief, counsel stated that she had complied with all *Anders* requirements and she requested that she be allowed to withdraw as Mother's appointed counsel. This Court notified Mother that her counsel had filed an *Anders* brief, that Mother had the right to file a pro se response to her counsel's *Anders* brief, and that Mother was entitled to a copy of the appellate record to assist in preparing her response. This Court provided Mother with a form motion to complete to request access to the appellate record. Mother did not file a motion requesting access to the appellate record, and she has not filed a pro se response to counsel's *Anders* brief.

Counsel's *Anders* brief states her professional opinion that no arguable grounds for reversal of the trial court's termination order exist and that any appeal would therefore lack merit and would be frivolous. *See Anders*, 386 U.S. at 744. Counsel's brief meets the minimum *Anders* requirements by presenting a professional evaluation of the record and stating why there are no arguable grounds for reversal on appeal. *See id.* at 744; *In re Schulman*, 252 S.W.3d 403, 406 (Tex. Crim. App. 2008) (stating that purpose of *Anders* brief is to assure appellate court that appointed attorney has made thorough and conscientious examination of record, provided court with appropriate facts of case and procedural history, and pointed out any potentially plausible points of error).

When we receive an *Anders* brief from an appointed attorney who asserts that no arguable grounds for appeal exist, we must determine independently whether arguable grounds exist by conducting our own review of the entire record. *Johnson v. Tex. Dep't of Family & Protective Servs.*, No. 01-08-00749-CV, 2010 WL 5186806, at *1 (Tex. App.—Houston [1st Dist.] Dec. 23, 2010, no pet.) (mem. op.); *In re K.D.*, 127 S.W.3d at 67; *see also Anders*, 386 U.S. at 744 (stating that it is responsibility of reviewing court—not appointed counsel—to determine whether appeal is frivolous). If we determine that arguable grounds for appeal exist, we abate the appeal and remand the case to the trial court to allow the appointed attorney to withdraw. *Johnson*, 2010 WL 5186806, at *2. Then, the trial court appoints another attorney to present all arguable grounds for appeal. *Id.* If, however, after independently reviewing the record, we conclude that the appeal is frivolous, we may affirm the trial court's termination judgment by issuing an opinion explaining that we have reviewed the record and found no reversible error. *Id.* The parent may challenge that holding by filing a petition for review with the Texas Supreme Court. *Id.*

We have reviewed the entire appellate record in this case and find no reversible error. We therefore affirm the trial court's judgment with respect to Mother. *See In re A.M.*, 495 S.W.3d 573, 582 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

In her *Anders* brief, Mother's counsel also requested that she be allowed to withdraw from representing Mother. In the context of a termination of parental rights case, the Texas Supreme Court has held that "counsel's belief that the client has no grounds to seek further review from the court of appeals' decision" is not "good cause" sufficient to justify counsel's withdrawal. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam); *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pet. denied) (denying motions to withdraw as counsel after filing *Anders* brief in termination of parental rights cases because, in light of *In re P.M.*, motions to withdraw did "not show 'good cause' [for withdrawal] other than counsels' determination that an appeal would be frivolous"); *In re A.M.*, 495 S.W.3d at 582–83 (following *In re P.M.* and denying counsel's motion to withdraw after filing *Anders* brief in termination case). Instead, counsel's duty to her client extends through the exhaustion of "all appeals." TEX. FAM. CODE ANN. § 107.016(3) (providing that in suit filed by governmental entity requesting termination of parent-child relationship, parent's appointed attorney ad litem "continues to serve in that capacity until the earliest of" (1) date suit is dismissed, (2) date "all appeals in relation to any final order terminating parental rights are exhausted or waived," or (3) date "attorney is relieved of the attorney's duties or replaced by another attorney after a finding of good cause is rendered by the court on the record"); *In re P.M.*, 520 S.W.3d at 26–27 (holding that "exhaustion of appeals" includes all proceedings

in Texas Supreme Court, including filing of petition for review); *In re A.M.*, 495 S.W.3d at 583. If Mother chooses to pursue a petition for review to the Texas Supreme Court, "appointed counsel's obligations can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *In re P.M.*, 520 S.W.3d at 27–28; *In re C.J.*, 501 S.W.3d at 255; *In re A.M.*, 495 S.W.3d at 583.

## Conclusion

We affirm the trial court's judgment terminating Mother's and Father's parental rights to Julie. We deny the request of Mother's appointed counsel to withdraw from representing Mother.


Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.